**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

MICHELLE COLLINS,        )
                                      )
              Plaintiff,       )
                                      )      Case No. 4:21-CV-0634-DGK
       v.                    )
                                      )
UNION PACIFIC RAILROAD COMPANY,   )
                                      )
            Defendant.     )

## ORDER GRANTING DEFENDANT SUMMARY JUDGMENT

This lawsuit arises from Plaintiff Michelle Collins's employment with Defendant Union Pacific Railroad Company ("Union Pacific"). Plaintiff alleges that while she worked in Union Pacific's Kansas City Supply Department and then its Transportation Department, she was subject to discrimination, harassment, and retaliation on the basis of her race in violation of 42 U.S.C. § 1981.

Now before the Court is Union Pacific's Motion for Summary Judgment. ECF No. 67. Because Plaintiff cannot establish a submissible case for any of these claims, the motion is GRANTED.

### Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must substantiate her allegations with "sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted). Finally, although employment discrimination cases are often fact based and depend on inferences rather than direct evidence, the Eighth Circuit has cautioned that this does not make them immune from the application of summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (clarifying "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.").

### Undisputed Material Facts

To resolve the motion, the Court must first determine the material undisputed facts. The Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c) (emphasis added); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, and proposed facts not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). Improperly controverted facts have also been excluded from the record. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

For purposes of resolving the motion, the Court finds the material undisputed facts to be as follows.

2

## Background

Union Pacific is an interstate freight railroad with more than 30,000 employees. It has a written anti-discrimination policy and maintains a "Values Line," which allows employees to anonymously report violations or concerns of alleged discrimination and harassment via a 24-hour hotline.

Plaintiff Michelle Collins is an African-American woman who was hired by Southern Pacific in 1979. Southern Pacific was later acquired by Union Pacific. Union Pacific hired Plaintiff as an Industrial Clerk in Houston, Texas. Through her 42-year tenure with the company, she has held over twenty other positions. None of her managers were persons of color.

While employed at Union Pacific, Plaintiff was always a member of the Transportation Communications Union ("TCU"). Union Pacific's collective bargaining agreement ("CBA") with TCU covers and governs, among other things, compensation terms for positions held by TCU members and the process for bidding and transferring between covered jobs.

Until May 2020, Union Pacific maintained a Supply Department in Kansas City (the "Supply Department") that operated in two locations: one in Kansas City, Missouri, known as the locomotive diesel shop ("KC01"), and one in Kansas City, Kansas, known as the train car materials shop ("KC03"). The two locations serviced the material needs of Union Pacific locomotives and railcars.

On March 30, 2009, Plaintiff exercised her seniority rights under the CBA to move into a Material Handler position in the Supply Department. The Supply Department consisted of Material Handlers/Clerks, a 1E Material Supervisor, and a Manager of Supply Operations. As Plaintiff describes it, her responsibilities as a Material Handler were similar to working at Home Depot, except that everything in the warehouse pertains to a freight car or an engine. Among

3

other things, Plaintiff ordered supplies, received supplies, issued supplies, and inventoried supplies. Plaintiff always worked at the KC01 shop, which operated twenty-four hours a day, seven days a week, and had three shifts.

**Plaintiff's Managers in the Supply Department**

**Craig Mitchell**

When Plaintiff began in the Supply Department, she reported to then-Manager of Supply Operations Craig Mitchell, who is Caucasian, until September 2010. Plaintiff started on first shift but later transitioned to second shift.

Plaintiff recalls Mitchell "started off fair" but claims he subjected her to discrimination while she reported to him. On one occasion, Mitchell required Plaintiff to vacuum a roof without a safety harness, which was not in her job description and was "out of the ordinary." Plaintiff does not remember when Mitchell required her to vacuum a roof other than that it was while she was on second shift. Plaintiff believes Mitchell's actions were discriminatory because "[she] was the only black woman there, and [Mitchell] didn't ask anyone else to climb up on a roof and vacuum."

On another occasion, Mitchell stopped Plaintiff from performing her pre-shift "Warm Up"[1] and changed her job duties because Plaintiff's white co-worker, Tammy (last name unknown), asked Mitchell to do so. This incident occurred at some point in 2010 or 2011.

Plaintiff also believes Mitchell discriminated against her in 2010 or 2011 by going along with Tammy's "piling on" work duties to Plaintiff. For example, Tammy succeeded in making Plaintiff responsible for transfers, which had previously been the first shift's responsibility. Now

---

[1] The Kansas City Supply Department had a daily process called "Warm Up to Work" during which employees watched a safety tape and performed exercises to loosen their muscles.

Plaintiff was responsible for both receiving materials and transfers. In response, Plaintiff called Union Pacific's EEO hotline. No one from the hotline ever followed-up with Plaintiff on her complaint.

In September 2010, Mitchell was promoted to Senior Manager of Supply Operations in North Little Rock, Arkansas, and so was no longer Plaintiff's supervisor. Plaintiff then reported to Manager of Supply Operations Trevette Fisher from on or around September 2010 through May 2012.

**John Schonert**

Plaintiff reported to Manager of Supply Operations John Schonert from May 2012 through February 2017. Plaintiff states he was "fair" and "distributed work evenly."

**Randy Bridge**

Randy Bridge, who is Caucasian, filled in as Manager of Supply Operations from on or around February 2017 through early April 2017. Plaintiff believes Bridge subjected her to discrimination on one occasion, in March 2017, when he wrongly accused her of leaving work early. After Plaintiff showed Bridge a time-stamped data entry that proved that she had not left work early, she did not receive any discipline for this incident.

**Samantha Miller**

In approximately April 2017, Samantha Miller, who is Caucasian, became the Manager of Supply Operations. Plaintiff reported to her. Plaintiff and Miller always worked different shifts; Miller worked first shift and Plaintiff worked second shift. Their shifts only overlapped for two hours each day, but Miller would sometimes monitor Plaintiff from home via video camera. Miller did not talk to Plaintiff during the time their shifts overlapped other than "off and on" to communicate about work-related topics. In their first encounter, on Miller's third day, Miller told

5

Plaintiff , "I'm here to make everybody's lives miserable."

Along with Plaintiff , the following Material Handlers were in the Supply Department and reported to Miller: Cindi Wood, Jeff Scott, Melanie Corum, Stephanie Vaughn, Kimberly Peterson, Nancy Avina, and Jolenta Goode. All these individuals are Caucasian, with the exception of Avina and Goode, who are Hispanic and African-American respectively.

Plaintiff alleges Miller subjected her to discrimination on multiple occasions. These discriminatory episodes are as follows:

First, on April 20, 2017, Miller prevented Plaintiff and another Material Handler, Avina, from taking a three-and-a-half day training course. Plaintiff did not consult Miller before applying for the course. Miller informed Plaintiff and Avina, via email, that the course was not a "standard safety training course" and that they were required to obtain management approval before enrolling in the course, even though it was not standard procedure to check with management before signing-up for training.

Plaintiff agrees Miller had the right to decide three days was too long for an employee to be out for training, but she thinks it would have been "more professional" if Miller had explained the basis of her decision or allowed one of the two employees to attend the training. The description for this training course indicated it was intended "for leaders at all levels and local/regional trainers (such as FG's, TSC Coordinators, and Training Coordinators)." Plaintiff did not hold any of the positions listed in the course description.

Second, Miller increased Plaintiff's workload. Shortly after joining the Supply Department, Melanie King, who is Caucasian, was promoted to the 1E Material Supervisor position, which is an entry-level supervisor position between Material Handlers (e.g., Plaintiff) and the Manager of Supply Operations (Miller) on first shift. While King's 1E Material

6

Supervisor predecessor, Peterson, had previously assisted in inventory-related tasks when performing this position, Miller directed King to stay in the office and not to leave. This effectively created a hardship for Plaintiff working on the second shift because it resulted in crates and pallets of work for the second shift to organize that had not been done on the first shift. By King no longer performing inventory-related tasks on first shift, Plaintiff believes she was required to perform the "workload of three, sometimes four people" due to additional inventory work falling to her on second shift.

Plaintiff does not know why Miller stopped requiring King to do inventory-related tasks or what tasks King performed instead of inventory-related tasks. Plaintiff suspects it is racism. Plaintiff admits Union Pacific also eliminated a first shift Material Handler position during this period that likely contributed to her increased workload. She does not know who made the decision to eliminate the position or the reason it was done. At the time, Plaintiff was the most senior Material Handler in the Supply Department and could have bumped to a different shift, including first, if she desired to do so.

Third, Miller screamed at Plaintiff to go home one day. Plaintiff requested yearly medical leave from Union Pacific under the Family Medical Leave Act ("FMLA") for her migraines and her husband's medical condition. On an unidentified day, Miller screamed at Plaintiff to leave work, claiming she was on medical leave when she was not. Plaintiff called Mitchell from her car, and he told her he would "take care of it" and instructed her to go home for the day with pay.

Shortly after this occurred, on or about June 2, 2017, Plaintiff submitted an anonymous complaint through the Values Line. It stated:

> Ongoing since 5/17, Samantha Miller has displayed negative performance. The caller states Samantha's behavior is unpredictable. Samantha switches from being nice to

7

unprofessional. Samantha abuses her power, and uses outraged communication with the employees. Samantha has upset 90% of the employees. Samantha has caused the employees distraction and stress. The caller and employees feel as though they are "walking on egg shells." On 6/1/17 the caller reported his/her concerns to Craig [Mitchell].

Plaintiff said nothing about race in her complaint.

Fourth, Miller screamed at Plaintiff after giving her inconsistent work instructions regarding "turnovers."[2] On an unidentified day, Miller instructed Plaintiff to stop doing turnovers at the beginning of her shift and, instead, go into daily warm-ups. Plaintiff complied with Miller's directive. On a subsequent day, after Plaintiff did not do a turnover and went straight into daily warm-ups, Miller hollered and screamed at Plaintiff and asked her why she did not do a turnover. Miller's behavior was so bad it caused Plaintiff to develop a migraine. When Plaintiff told Miller she needed to leave due to her migraine, Miller said Plaintiff needed to find her own replacement and left the building. Thereafter, Plaintiff again called Mitchell, who told Plaintiff to go home for the day with pay. Plaintiff was paid for this day but had to use her sick leave.

Fifth, Plaintiff believes Miller retaliated against her the next day when Plaintiff went back by giving her an attendance warning and allegedly docked her pay. On or around September 2017, Plaintiff was blocked by a train, which caused her to be three minutes late to work. Miller wrote Plaintiff up for being tardy and docked her pay for 15 minutes' worth of time, despite the practice of employees not being docked for lateness if they were blocked by a train. This write-up, however, was only an attendance "warning."

Sixth, Miller attempted to prevent Plaintiff from scheduling vacation days. Before Miller

---

[2] A "turnover" is an informational meeting between two employees who hold the same position on successive shifts to discuss any notable operational issues and facilitate a smooth transition of the day's work.

8

joined the Supply Department, in November of each year Material Handlers selected vacation days for the following year. The selections were made in order of seniority because only one Material Handler could be on vacation at a time. As the most senior Material Handler in the Supply Department, Plaintiff had priority on selecting vacation days. When Miller joined the Supply Department, she "redid the vacation book" and assigned all Material Handlers vacation days except for Plaintiff. When Plaintiff asked Miller about her missing vacation days, Miller instructed Plaintiff to add her vacation days back to the vacation book on any open days, which destroyed Plaintiff's top-seniority standing.

In response, Plaintiff spoke to Assistant Vice President of Supply Chain Operations, Peter Newton, who is Caucasian, about Miller. Plaintiff told Newton about her unfair workload, Miller yelling at Plaintiff to go home while on medical leave, Miller screaming at her after she skipped turnovers, and Miller preventing her from scheduling vacation. Plaintiff also told Newton that Miller mistreated other Material Handlers in the Supply Department. She reported that Miller had screamed and hollered at Peterson; she had screamed and hollered at Wood and also called Wood a liar; and Miller had told Goode that she could not come to work. Peterson and Wood are Caucasian; Goode is African-American.

Plaintiff told Newton that Miller mistreated Plaintiff because she was black, but she did not tell Newton that Miller mistreated anyone else, including Goode, because of their respective races. Newton subsequently took possession of the vacation book and then held a meeting with the entire Supply Department in which he asked everyone to discuss their work environment. During the meeting, Plaintiff discussed the incidents she had previously addressed with Newton. That same day, Newton met with Miller, and then Miller allowed Plaintiff to put her preferred vacation days in the vacation book, even if she had to bump another employee's vacation to do so.

9

Plaintiff admits the vacation scheduling issue was "fixed" after Plaintiff spoke with Newton.

Seventh, Miller denied Plaintiff's overtime pay under the CBA. While in the Supply Department, Plaintiff took five paid vacation days and a less senior employee covered her shifts. The five shifts totaled 40 hours of work. By covering for Plaintiff, the other employee was eligible for overtime compensation and so the 40 hours he worked for Plaintiff were paid at his overtime rate.

Union Pacific initially paid Plaintiff for 40 hours at her regular hourly rate for her five vacation days. Plaintiff contends that under the CBA, if an employee covering another employee's vacation shift is paid at an overtime rate for such shift, the vacationing employee is also entitled to be paid at an overtime rate for such shift. Plaintiff filed a grievance pursuant to the CBA to challenge the amount of her vacation pay, the TCU advanced the grievance, and during the grievance process Union Pacific offered a settlement where it agreed to pay additional money to Plaintiff at the covering employee's overtime rate. Ultimately, at the TCU's suggestion, Plaintiff agreed to the proposed settlement. But Plaintiff still maintains she is entitled to additional pay for her five vacation shifts because Union Pacific paid her at the covering employee's overtime rate rather than her own. Plaintiff does not know who from Union Pacific made the decision to pay a portion of her claimed overtime pay in the grievance process.

Plaintiff additionally alleges she was similarly underpaid for overtime on three other occasions. Each time, Plaintiff filed a grievance and then reached a settlement during the grievance process.

Miller left Union Pacific on or about June 2, 2018.

**Jennifer Perkins**

Jennifer Perkins, who is Caucasian, then became the Manager of Supply Operations of the

10

Supply Department and Plaintiff reported to her.   On one occasion, Plaintiff asked Perkins about her overtime pay issue that occurred while Miller was the Manager of Supply Operations, and Perkins told her it was Mitchell's "call" to make.   Other than this incident, Plaintiff does not believe Perkins treated her unfairly because of her race.

**Plaintiff's Managers in the Transportation Department**

In October 2019, Union Pacific decided to close the Supply Department and Plaintiff transferred to the Kansas City Transportation Department.   All the Material Handlers, including Plaintiff, had the option to stay on as temporary employees, or they could exercise their seniority and bump into a different position with the company.   Plaintiff chose to stay on as a temporary employee for approximately three months.   On December 19, 2019, Plaintiff exercised seniority to bump into a Yard Office Coordinator ("YOC") position – also called a "Chief Clerk" position – in the Kansas City Transportation Department ("Transportation Department").   As a consequence of Plaintiff bumping into the Transportation Department, a less-senior YOC, Cheryl Harris, who is Caucasian, was forced to move to a different shift.

Other than management, the Transportation Department consists of Utility Clerks and YOCs.   Utility Clerks drive company vehicles to transport train crews to and from various rail yards in the Kansas City area.   YOCs are responsible for a variety of tasks, including, but not limited to, dispatching the Utility Clerks, processing paperwork, and generally tracking when and where trains arrive/depart to ensure Utility Clerks are properly dispatched throughout the Kansas City-area rail yards to transport crews.   The Transportation Department operates twenty-four hours a day, seven days a week, and has three shifts.

**Jeremy Schultz, Steve O'Neal, and Aaron Keith**

As a YOC, Plaintiff initially reported to two Managers of Operating Practices:   Jeremy

Schultz and Steve O'Neal.   Schultz and O'Neal rotated shifts to jointly manage all three Transportation Department shifts.   During this period another Manager of Operating Practices, Aaron Keith, also had supervisory authority over YOCs, including Plaintiff.   Schultz, O'Neal, and Keith reported to Senior Manager of Control Operations Michael O'Hara , and O'Hara reported to Superintendent of Train Operations Ryan Curtis.   Schultz, O'Neal, Keith, O'Hara, and Curtis are all Caucasian.

As part of her lawsuit, Plaintiff alleges she received insufficient training as a YOC. Plaintiff trained with Harris, the individual she bumped, until Harris treated her rudely, telling Plaintiff she had no time to train her.   Thereafter, Plaintiff trained with someone else.   Plaintiff and Harris were peers; neither individual held supervisory authority over the other.

YOCs are normally allowed thirty days to train for their position and can request additional training if needed.   Plaintiff believes she was only given "approximately 18 days" of training and recalls that she requested additional training from Schultz but was denied.   However, Union Pacific's business records show Plaintiff received twenty-six days of training, the longest training period given to any YOC with whom Plaintiff worked in the Transportation Department, including multiple white YOCs.

After her training, Plaintiff alleges another YOC, Rhonda VanLew, mistreated her by performing turnovers badly which made Plaintiff's job more difficult.   YOCs in successive shifts are required to perform turnovers with one another to discuss any notable operational issues and facilitate a smooth transition of the day's work.   The YOC being relieved uses the turnover to tell the next YOC the "most important things that are going on at that time" and to leave the next YOC in a position to walk in and do his or her job.   After Plaintiff's training, VanLew was the second shift YOC and Plaintiff was the third shift YOC.   Accordingly, VanLew provided turnovers to

12

Plaintiff.  Plaintiff and VanLew were peers; neither individual held supervisory authority over the other.  VanLew is one-quarter Native-American but she identifies as Caucasian and "looks white."

VanLew's turnovers to Plaintiff and two other YOC's of color, Kantrell Robinson and Avina, were unsatisfactory.  VanLew never loaded paper in the printers, she often left the radio volume turned down, she allowed crews to sit in the waiting room without being dispatched, and she created a chaotic environment for Plaintiff to take over.

VanLew was a YOC from approximately 2014 through February 2020 and always did turnovers in the same manner, regardless of the individual to whom she provided the turnover. There is no evidence that VanLew's turnovers to white YOC's were any better than to those made to Plaintiff, Robinson, and Avina.  In fact, one Caucasian YOC, Jenny Frazier, also complained about VanLew's turnover practices.

In or around early 2020, Plaintiff reported VanLew's turnover-related behavior to their supervisor, Schultz, who sat in on their turnovers for a "couple [of] weeks" until he mistakenly believed Plaintiff and VanLew had managed their differences.

Keith also sat in on one of Plaintiff's and VanLew's turnovers due to the apparent conflict between the two.  On this occasion, Keith recalls Plaintiff was angry at VanLew, but Plaintiff could not tell Keith what additional information she required from VanLew in the turnover.

On May 7, 2020, Plaintiff submitted a complaint through the Values Line.  At this time when an employee made a Values Line complaint, the call first went to a third-party company, NAVEX, who received the call and prepared a report of the complaint that would be sent to Union Pacific's compliance team.  Thereafter, a member of Union Pacific's Corporate Investigations

team would contact the employee about the complaint.

NAVEX prepared a report of Plaintiff's May 7, 2020, complaint containing the following "Incident Description," which did not include anything race-related. It stated:

> Michelle Collins reported unprofessionalism and mistreatment from Cheryl Harris and Rhonda Vanlou.
>
> Michelle said Cheryl seems to have taken a personal stance against her after Cheryl was bumped from her position. From the start, Cheryl told Michelle that she had no time to train her. Ever since then, Cheryl has behaved in a mean and rude manner with Michelle. Cheryl is either loud and with negative tone in her responses or has simply ignored Michelle even though it is necessary for Michelle to communicate properly with Cheryl in order to do her job properly.
>
> With Rhonda, Michelle has repeatedly had to make excuses for why Rhonda did not do something or did not properly follow turnover procedures when relieving Rhonda. Rhonda is also harsh, short and rude with her responses to Michelle such as saying that Michelle should know things already after so much time with the company.
>
> Michelle has already gone to all of management but nothing has been resolved. Michelle said she is not trying to get anyone in trouble or cause problems but wants someone from the company to come down and resolve this issue.

Plaintiff does not remember exactly what she told NAVEX when making her Values Line complaint, but she agrees the Incident Description seems to be an accurate account of her conversation.

That same day, VanLew submitted a Values Line complaint about Plaintiff. It stated:

> For the last two months, Michelle Collins has been repeatedly complaining to management about Rhonda, accusing Rhonda of incompetence in her role. Michelle is very rude and disrespectful towards Rhonda when she does this, often harassing Rhonda directly with these same accusations in a condescending and snippy tone. This has gotten so bad that Rhonda has sometimes had to ask a

14

manager to be present during their shift turnover, which does seem to prevent Michell from behaving this way.

Rhonda has complained about this to Jeremy and to Michael, but both of them seem hesitant to take any direct action to address the matter; Jeremy seems to want to blame both Rhonda and Michelle for the situation, and Michael has only encouraged them to get along better.

Rhonda is concerned that Jeremy's and Michaels' reticence to address the matter may be race-related, as Michelle is African-American. Of note, Rhonda happens to be Native American, which she can supply documentation to support.

Rhonda hopes that this report will prompt the company to look into the matter further and take strong steps to end Michelle's behavior. Rhonda has phone recordings of Michelle's abusive speech that she can make available to the investigator of this report upon request.

On or about May 12, 2020, Analyst in Corporate Investigations Kimberly Pfeiffer, who is Caucasian, contacted Plaintiff to schedule a time to discuss her complaint. Because Plaintiff and VanLew's complaints involved the same people, Pfeiffer treated them as a "combined complaint" and investigated the two complaints together.

On May 18, 2020, Pfeiffer interviewed Plaintiff about her complaint. During the 30-minute interview, Pfeiffer typed notes from the conversation as verbatim as she could into an "interview form" document. The interview form contains no reference to Plaintiff's race. Plaintiff admits she did not mention anything about her race when she initially submitted her Values Line complaint to NAVEX or during her subsequent interview with Pfeiffer.

On June 6, 2020, Pfeiffer interviewed VanLew about her complaint and documented her notes in an interview form. VanLew stated that she went home crying each night due to her interactions with Plaintiff; VanLew's supervisors threatened her job if the two could not get along;

15

VanLew felt she was being bullied and in a hostile work environment; and VanLew felt Schultz and Keith were unwilling to discipline Plaintiff due to her race.

On August 19, 2020, Pfeiffer interviewed Keith and documented her notes in an interview form. Keith told Pfeiffer he was aware of a prior conflict between Plaintiff and VanLew related to turnovers, he had sat in on one of their turnovers and did not see a conflict, and he had not heard anything recently related to their conflict.

On October 1, 2020, Pfeiffer interviewed Schultz and documented her notes in an interview form. Schultz told Pfeiffer that he understood Plaintiff felt VanLew did not provide her enough information in turnovers. He told Pfeiffer that he had sat in on their turnovers, and neither Plaintiff nor VanLew were being "cordial" to the other. Schultz had put together a one-page "cheat sheet" detailing what needed to take place in the turnovers, and he did not believe there was still a problem between the two.

On October 1, 2020, Pfeiffer interviewed Keith's and Schultz's supervisor, Curtis, and documented her notes in an interview form. According to Pfeiffer's notes, Curtis told Pfeiffer he was aware of a conflict between Plaintiff and VanLew related to turnovers. He did not know the specifics but understood both Plaintiff and VanLew were being "nasty" to each other. He was aware Schultz had sat in on their turnovers, and he had not heard anything about it in quite some time.

Pfeiffer did not interview Harris because of a COVID-related temporary layoff, and Harris separated from Union Pacific before Pfeiffer returned from the layoff to interview her.

On October 1, 2020, Pfeiffer sent a synopsis of her investigation to her supervisor, Director of Corporate Investigations Molly Wallace, which contained the following conclusion and

16

recommendation:

> **Conclusion:** Three managers confirm there was a conflict between the Yard Office Coordinators and that they have addressed this matter; therefore, this report is substantiated.

> **Recommend Action/Outcome:** It has been confirmed that the allegations in this report are presently not a concern and local management has not had to address this matter since it originally occurred. No further recommendation is needed as local management has handled it appropriately.

On October 1, 2020, Pfeiffer informed Plaintiff her complaint was closed and appropriate action had been taken, which was a reference to the fact that managers had observed Plaintiff's and VanLew's turnovers and had created a cheat sheet for them to use. Pfeiffer also sent a closure note to VanLew on October 1, 2020, but VanLew does not recall receiving it. Neither Plaintiff nor VanLew were disciplined following the Values Line complaint investigations.

On October 17, 2020, Plaintiff failed to notify Schultz that a crew was going to be late. Thereafter, Plaintiff recalls hearing Schultz's manager, Curtis, instruct Schultz to terminate Plaintiff based on the incident, but Schultz declined to do so. Schultz told Curtis that Plaintiff was "one of [his] best clerks" and that he would have to terminate all the YOCs if he terminated Plaintiff.

Schultz determined the best way to keep from terminating Plaintiff would be to have her take a drug and alcohol test. According to Schultz, Curtis told Schultz to "disqualify" Plaintiff from being a YOC, and Schultz did not agree that she needed to be disqualified.

Because she was so stressed out, on October 17, 2020, Plaintiff executed a "waiver" in which she acknowledged responsibility for the late crew incident, waived her right to a disciplinary hearing, and agreed to submit to a drug and alcohol test. Plaintiff took and passed the drug and

17

alcohol test.

Schultz described the incident as follows in Plaintiff's disciplinary file, noting Plaintiff had been reminded of this issue before:

> After numerous reminders that the Chief Clerk must notify a manager if there is a delay in getting a crew to their train, the Chief Clerk failed to do so again. This caused a significant delay and likely will contribute to a re-crew of the train, prior to reaching destination.

Plaintiff was not suspended for the late crew incident and did not lose any pay because of the late crew incident, but she did feel humiliated and embarrassed.

On an unidentified day, Plaintiff was five minutes late to her scheduled shift because she had been blocked by a train. On this occasion, VanLew marked on her timesheet that she should be docked five minutes of pay. Plaintiff later challenged the pay reduction to Keith, but Keith refused to withdraw the reduction. Plaintiff does not believe other employees were docked pay when they were late due to being blocked by train.

In early 2021, Plaintiff exercised seniority to "bump" from third shift to first. Under the CBA, an employee exercising seniority is to remain in his or her former position until "relieved" by another employee (i.e., when the former position is backfilled). The CBA requires an employee be relieved "as soon as practicable" but does not provide a deadline for this to occur. After Plaintiff exercised seniority, she was not allowed to switch to first shift for "over a month." The first shift employee who she bumped was released right away but Plaintiff was required to remain on third shift while her position was "put up for bid." Plaintiff does not know why she was prevented from switching to first shift for over a month. Plaintiff eventually spoke to Schultz and someone from Union Pacific's headquarters about the delayed shift change but cannot recall what either individual said was the reason for the delay. She also spoke to a union representative

18

who said the delay was not fair and not according to the CBA.   Plaintiff was ultimately released to first shift in February 2021, which meant she no longer received turnovers from VanLew.

**Plaintiff Retired in April 2021**

Plaintiff retired from Union Pacific on April 7, 2021, because she felt mistreated, unappreciated, and discriminated against.

On September 1, 2021, Plaintiff initiated this action.

On February 1, 2022, Plaintiff testified in Avina's trial against Union Pacific.[3]   During the trial, Plaintiff testified extensively about her in-person meeting with Newton and never mentioned that she told Newton she thought she was mistreated based on her race.   Plaintiff admits she never heard Miller, Mitchell, Perkins, Schultz, O'Neil, VanLew, or Harris use a racial slur.   Plaintiff recalls that Wood also submitted a Values Line complaint about Miller during their time in the Supply Department because Wood was "under a lot of stress from [Miller] screaming at her."   She also recalls Peterson—who is Caucasian—submitted a Values Line complaint about Miller during their time in the Supply Department.

When Plaintiff left the Supply Department, she was making approximately $26.51 per hour.   She made approximately $32.39 per hour upon her April 2021 retirement.

**Discussion**

The Amended Complaint, ECF No. 15, alleges one count: "Race Discrimination/Retaliation/Hostile Work Environment" in violation of 42 U.S. § 1981.   Although brought as one count, these are three separate claims.   The Court analyzes each below.

**I.     Plaintiff's race discrimination and retaliation claims fail because she did not suffer**

---

3 *Avina v. Union Pacific R.R. Co.*, 4:19-cv-00480-RK.

**an adverse employment action.**

The parties appear to agree that Plaintiff does not have direct evidence of discrimination, thus she must prove intentional discrimination under the *McDonnell Douglas* burden-shifting framework. *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015). Under that framework, the plaintiff must first establish a prima facie case. *Huynh v. U.S. Dep't of Transp.*, 794 F.3d 952, 958 (8th Cir. 2015). If she does, then the burden shifts to the defendant to offer legitimate, non-discriminatory reasons for its actions. *Id.* If the defendant can establish a legitimate, non-discriminatory reason for doing so, the burden shifts back to the plaintiff to prove the defendant's reasons were a pretext for discrimination. *Id.*

The elements of a race discrimination claim are: (1) the plaintiff is a member of a protected class; (2) the plaintiff met the employer's legitimate job expectations; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently). *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873–74 (8th Cir. 2010).[4] Union Pacific argues Plaintiff cannot establish the third or fourth elements.

With respect to the third element, Union Pacific contends: (1) Plaintiff cannot establish an actionable adverse action because discrete acts occurring before September 1, 2017 (four years before she filed her case) are time barred; (2) her allegations claiming she was paid underpaid four times while working in the Supply Department require interpretation of the CBA and so are preempted by the Railway Labor Act; and (3) her remaining allegations do not rise to the level of

---

[4] Plaintiff's § 1981 claims are analyzed in the same manner as Title VII disparate treatment claims. *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703 (8th Cir. 2005).

materially adverse employment actions.

Plaintiff responds that acts occurring before September 1, 2017, are not time barred with respect to her hostile work environment claim (her brief is silent with respect to whether they are time barred with respect to her other claims); and her case does not depend on interpretation of the CBA so there is no preemption issue.[5]  Most notably, she concedes she experienced no discrete acts of mistreatment.[6]

Assuming for the sake of argument that the Court can consider acts occurring before September 1, 2017, the Court holds Plaintiff still cannot show she suffered an adverse employment action, the third element.  "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage.  This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Charleston v. McCarthy*, 926 F.3d 982, 989 (8th Cir. 2019) (internal quotation marks omitted). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."  *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007).     In certain circumstances, "lesser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment

---

[5] She also intimates in her proposed statement of facts that she was forced to retire, suggesting she has a constructive discharge claim as well.   Because she neither pleaded such a claim nor responded to Union Pacific's arguments that she was not constructively discharged, Def.'s Mem. in Supp. at 28-29, ECF No. 68, any constructive discharge claim has been waived and/or abandoned.

[6] She writes:

> "Discrete acts" are those "such as termination, failure to promote, denial of transfer, or refusal to hire," which "are easy to identify."  Morgan at 114.  **No such "discrete acts" are at issue here.** "Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct."  Morgan at 115.  Exactly what we have here.

Pl.'s Resp. at 3 (emphasis added); ECF No. 74.

consequences' that adversely affect or undermine his position." *Charleston*, 926 F.3d at 989 (internal quotation marks omitted).

Here, Plaintiff admits she suffered no discrete acts of discrimination, such as a demotion or cut in pay, and the record does not establish a series of lesser actions that cumulatively amount to serious employment consequences. This is fatal to her race discrimination and retaliation claims.

The closest thing to a discrete act of discrimination Plaintiff experienced was four episodes of alleged underpayment while working in the Supply Department, when an individual who covered her shift was paid at an overtime rate under the CBA, which—she contends—means she should have been paid at an overtime rate as well. Whether she was underpaid or not is a dispute concerning the meaning or proper application of a particular provision in the CBA with respect to that specific situation. Here, this is partially evidenced by the fact that each time this alleged underpayment occurred, Plaintiff filed a grievance under the CBA. As such, these allegations are completely preempted by the Railway Labor Act and cannot be litigated here. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n.*, 491 U.S. 299, 303–04 (1989); *see Johnson v. Humphreys*, 949 F.3d 413, 416 (8th Cir. 2020) (finding complete preemption in a case analyzed under the *McDonnell Douglas* framework where interpretation of a CBA provision was inextricably intertwined with the plaintiff's prima facie case). Plaintiff's claims that she was wrongfully not allowed to move shifts immediately after exercising her seniority while Union Pacific attempted to "backfill" her position are similarly preempted by the Railway Labor Act.

Plaintiff's remaining allegations—for example, that Miller screamed at her and was rude to her; that she received insufficient training; that her pay was docked $6.75 and $2.75 for showing up late on two different occasions—do not rise to the level of an adverse employment action. *See,*

*e.g., Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002) ("personal animus, hostility, disrespect, and ostracism" did not rise to the level of an adverse employment action); *Watson v. Wilkie*, No. 4:17-00192-CV-RK, 2019 WL 3358560, at *5 (W.D. Mo. July 24, 2019) (holding the failure to provide "training and orientation" is not an adverse action); *Haskell v. CentraCare Health Sys.- Long Prairie*, 952 F. Supp. 2d 838, 848–49 (D. Minn. 2013) (holding a weekly pay reduction of $4.50 was insufficient to constitute a materially adverse employment action).

Thus, Plaintiff cannot establish the third element for a race discrimination or retaliation claim. Because this holding is dispositive, the Court need not address Union Pacific's argument that Plaintiff cannot establish the fourth element for these claims either.

## II. Plaintiff's hostile environment claim fails because she cannot establish that she was subjected to severe or pervasive harassment based on her race.

To succeed on a hostile work environment claim, a plaintiff must show: "(1) she is a member of a protected group, (2) unwelcome harassment occurred, (3) a causal nexus existed between the harassment and her protected status; and (4) the harassment affected a term, condition, or privilege of employment." *Hairston v. Wormuth*, 6 F.4th 834, 841 (8th Cir. 2021) (internal quotation marks omitted); *see also Williams v. Arkansas Dep't of Correction*, 438 F. App'x 535, 536 (8th Cir. 2011) (observing "Title VII and 42 U.S.C. § 1981 claims alleging hostile work environment are analyzed under identical standard"). The standard for demonstrating a hostile work environment is "demanding, and does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017) (internal quotation marks omitted) (applying standard in the Title VII context).

Union Pacific argues Plaintiff cannot establish the third or fourth elements. The Court

23

only addresses the fourth element because it is plainly dispositive.

The Eighth Circuit has cautioned that the fourth element imposes "a high threshold." *Id.* It requires a plaintiff to show that "the harassment she experienced was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Hairston*, 6 F.4th at 841. This element contains both "objective and subjective components" that require her to show the harassment she endured created "an environment that a reasonable person would find hostile or abusive, and that [she] subjectively perceived the environment to be abusive." *Carter v. Atrium Hospitality*, 997 F.3d 803, 811 (8th Cir. 2021). In determining whether she meets this burden, the Court must "look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with her work performance." *Hairston*, 6 F.4th at 842 (internal quotation marks omitted). The Eighth Circuit has been clear that "[m]erely rude or unpleasant conduct are insufficient to affect the terms and conditions of employment." *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 922–923 (8th Cir. 2018) (internal quotation marks omitted). Instead, a plaintiff must establish "that the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (internal quotation marks omitted).

As Union Pacific notes, in practice, this standard is quite high. *See, e.g., Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004) (finding racially offensive remarks about Asians ("Jap," "nip," "gook") made approximately once-a-month for two years to an employee who was married to a woman of Japanese descent insufficient to establish a hostile work environment claim); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843–44 (8th Cir. 2002) (finding three instances where the plaintiff heard that racial epithets had been used to

24

describe him, in addition to other "sporadic racially-motivated misconduct," could not sustain a hostile work environment claim).[7]

The conduct here does not come close to rising to the level of "severe and pervasive" under controlling Eighth Circuit caselaw. Plaintiff's allegations about Miller, even if race-related,[8] concern ordinary employee-supervisor interpersonal conflict, which are insufficient. *See, e.g., Burgett v. Yellen*, No. 4:18-CV-00309-BCW, 2021 WL 4029313, at *4 (W.D. Mo. Mar. 26, 2021) (finding no actionable harassment where "managers followed plaintiff and subjected him to constant surveillance, discussed private and confidential information about him with other management officials and employees, closely scrutinized his work, had armed security officers escort him from the building after his termination, and [] snatched documents off his desk"); *Harris v. Nicholson*, No. 4:06CV463 CDP, 2008 WL 4332103, at *2 (E.D. Mo. Sept. 17, 2008) (no claim where manager gave plaintiff more frequent "write-ups" than white co-workers, denied her a shift opportunity, asked about the plaintiff's whereabouts, and questioned the legitimacy of excused absences).

Similarly, Plaintiff's mistreatment in training and during turnovers by her peers in the Transportation Department do not rise to this level: Harris declined to train her, and VanLew never loaded paper in the printers, often left the radio volume turned down, and allowed crews to sit in the waiting room without being dispatched, which set-up Plaintiff to fail. These actions, even if race-related, fall well short of those that have been deemed actionable harassment by the Eighth Circuit. Nor can the fact that Plaintiff was twice docked minute amounts of pay or given one drug

---

[7] Plaintiff's citation to three Eighth Circuit cases from the 1990s, Pl.'s Resp. at 6–8, one of which does not even assert a hostile work environment claim, is unavailing.

[8] Frankly, the record here establishes Miller was a horrible boss to everyone, including white employees.

25

and alcohol test sustain a harassment claim, because they are too infrequent. *See, e.g., Carpenter v. Con-way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) ("Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment."). These incidents comprised three events over a four-year span and cannot be said to have poisoned Plaintiff's work environment. Accordingly, Union Pacific is entitled to summary judgment on Plaintiff's hostile work environment claim.

## Conclusion

For the reasons set forth above, Union Pacific's Motion for Summary Judgment, ECF No. 67, is GRANTED.

**IT IS SO ORDERED.**

Date:   June 22, 2023                  /s/ Greg Kays
                                       GREG KAYS, JUDGE
                                       UNITED STATES DISTRICT COURT

26